438 So.2d 923 (1983)
EASTERN AIR LINES, INC., a Delaware Corporation, Appellant,
v.
Daniel G. GELLERT, Appellee.
No. 80-2376.
District Court of Appeal of Florida, Third District.
October 4, 1983.
*926 Blackwell, Walker, Gray, Powers, Flick & Hoehl and James E. Tribble, Miami, for appellant.
David Popper, Richard M. Gale, Miami, for appellee.
Before DANIEL S. PEARSON and FERGUSON, JJ., and WILLIAM C. OWEN, Jr., Associate Judge.
DANIEL S. PEARSON, Judge.
Eastern Air Lines, Inc. (Eastern) appeals from a judgment for Gellert for compensatory and punitive damages in an action for defamation. It asserts, inter alia, that it was entitled to a directed verdict and judgment in its favor because the evidence failed to establish that it, through its agent, made a defamatory statement of fact concerning Gellert; that, at least, Gellert was not entitled to punitive damages against Eastern; and that, in any event, it is entitled to a new trial because it was unduly restricted by the trial court in the exercise of its peremptory challenges to prospective jurors. Gellert cross-appeals, contending that if there is any insufficiency in his proof to establish Eastern's liability for punitive damages, such insufficiency was created by the trial court's erroneous exclusion of certain proffered evidence on the ground that it concerned matters too remote in time.
We first examine Eastern's claim that it was entitled to a directed verdict in its favor because the evidence failed to establish a defamatory statement of fact. If Eastern is correct in this contention, it will be unnecessary for us to consider the remaining issues.
In November 1978, one David Blundy, a reporter for the London Sunday Times, called James Ashlock, the director of Eastern's news bureau, and in a telephone interview sought Ashlock's reaction to Gellert's written and verbal allegations that he had been penalized by Eastern for publicly disclosing an alleged defect in the design of the L-1011-type passenger aircraft then in use by Eastern.[1] Ashlock, who knew that his statement would be published, is quoted as having stated:
"Gellert has been complaining for years. I think you ought to know that he wrote some very odd letters to the FBI... . He said Eastern was out to get him, that we tried to crash a plane in order to kill him. He's paranoid."
The article further reports that when Ashlock was then asked why Gellert was allowed to fly Eastern's passenger jets, he replied:
"It's awfully hard to fire anyone these days. Anyway, we have three of them in the cockpit. Know what I mean?"
*927 Eastern's position is that the foregoing statements by Ashlock are statements of opinion, not of fact, and as such cannot form the basis for an action for defamation. Of course, Eastern is correct that statements of pure opinion cannot constitute actionable defamation. Gertz v. Robert Welch, Inc., 418 U.S. 323, 340-41, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789, 805 (1974); Old Dominion Branch No. 496, National Association of Letter Carriers v. Austin, 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974); White v. Fletcher, 90 So.2d 129 (Fla. 1956); Lampkin-Asam v. Miami Daily News, Inc., 408 So.2d 666 (Fla. 3d DCA 1981); Coleman v. Collins, 384 So.2d 229 (Fla. 5th DCA 1980); Palm Beach Newspapers, Inc. v. Early, 334 So.2d 50 (Fla. 4th DCA 1976). Accord, Mashburn v. Collin, 355 So.2d 879 (La. 1977). However, a statement that although ostensibly in the form of an opinion "implies the allegation of undisclosed defamatory facts as the basis for the opinion," Restatement (Second) of Torts § 566 (1977), is actionable. The difference between the former, unactionable, pure opinion and the latter, sometimes called "mixed opinion," is that:
"Pure opinion occurs when the defendant makes a comment or opinion based on facts which are set forth in the article or which are otherwise known or available to the reader or listener as a member of the public. Mixed expression of opinion occurs when an opinion or comment is made which is based upon facts regarding the plaintiff or his conduct that have not been stated in the article or assumed to exist by the parties to the communication." From v. Tallahassee Democrat, Inc., 400 So.2d 52, 57 (Fla. 1st DCA 1981).
It is the court's function to determine from the context "whether an expression of opinion is capable of bearing a defamatory meaning because it may reasonably be understood to imply the assertion of undisclosed facts that justify the expressed opinion about the plaintiff or his conduct... ." Restatement (Second) of Torts § 566, comment c. See From v. Tallahassee Democrat, Inc., 400 So.2d at 57; Mashburn v. Collin, 355 So.2d at 885-86. If Ashlock's statement would likely be reasonably understood by ordinary persons as a statement of an undisclosed existing defamatory fact, then it was properly the jury's function to determine whether a defamatory meaning was attributed to it by recipients of the communication, and Eastern was not entitled to a directed verdict in its favor.
Eastern contends that Ashlock's statement about Gellert, "He's paranoid," was based on the earlier disclosed facts that Gellert had written some letters to the F.B.I. in which he said that Eastern was out to get him and had tried to crash a plane in order to kill him. Were this the extent of Ashlock's statement, we would agree with Eastern that the ordinary reader would not consider the statement to suggest that Gellert actually suffered from the mental affliction of paranoia, but rather would consider the statement to be Ashlock's opinion based on the disclosed actions of Gellert, that is, he's paranoid because he goes around saying that we tried to crash a plane in order to kill him. See, e.g., Lampkin-Asam v. Miami Daily News, Inc., 408 So.2d 666 (article characterizing accusations made by plaintiff as "almost paranoid" considered to be expression of pure opinion entitled to absolute constitutional protection where accusations appeared in article); Wetzel v. Gulf Oil Corp., 455 F.2d 857 (9th Cir.1972) (calling plaintiff "nuts" and "crazy" in context of and in response to plaintiff's demand that gas station pay for costs incurred when attendant at defendant's gas station allegedly added wrong fluid to brake fluid considered to be expression of pure opinion based on disclosed facts); Fram v. Yellow Cab Co. of Pittsburgh, 380 F. Supp. 1314 (W.D.Pa. 1974) (statement by defendant company's representative on television show that something plaintiff had said earlier on same show sounded "a little bit like the sort of paranoid thinking that you get from a schizophrenic" considered to be pure opinion in context of rebuttal of plaintiff's accusations). However, Ashlock's statement goes further. When asked by the Times reporter why Gellert, whom Ashlock had just described as paranoid, was *928 allowed to continue to fly Eastern's passenger jets, Ashlock replied:
"It's awfully hard to fire anyone these days. Anyway, we have three of them in the cockpit. Know what I mean?"
We think this response by Ashlock was susceptible of being reasonably understood by the ordinary listener or reader to imply that quite apart from Ashlock's opinion that Gellert was paranoid because of his "odd letters to the FBI," or because he said "we tried to crash a plane in order to kill him," Gellert was in fact paranoid, that is, suffering from a mental affliction which would justify his being discharged were it not for it being "awfully hard to fire anyone these days," and which would prevent Eastern from entrusting one of its aircraft to his sole responsibility ("we have three of them in the cockpit").
Having decided that Ashlock's statement is not pure opinion, we turn to the less difficult question of whether a statement is defamatory when, as here, it implies that the plaintiff suffers from a mental affliction incompatible with his ability to carry out the responsibilities of his occupation.[2] The answer, of course, is that any publication, oral or written, which imputes to another a condition incompatible with the proper exercise of his trade or profession, amounts to a slander or libel per se. Campbell v. Jacksonville Kennel Club, 66 So.2d 495, 497 (Fla. 1953); Layne v. Tribune Co., 108 Fla. 177, 180, 146 So. 234, 236 (1933). And, most assuredly, a publication which suggests an impairment in plaintiff's mental faculties, even short of suggesting insanity, is one which imputes to him a condition incompatible with the proper exercise of his trade or profession if made in that context. Hoover v. Peerless Publications, Inc., 461 F. Supp. 1206 (E.D.Pa. 1978) (statement to a prospective employer that plaintiff had "some mental problems" in former employment actionable per se); Demers v. Meuret, 266 Or. 252, 512 P.2d 1348 (1973) (statement "what kind of protection can you give us from this terrible mean demented old man ... he might come out and chop our airplanes up with an axe" actionable per se where words prejudiced the plaintiff, an airline executive, in his profession or trade); Cavanagh v. Elliot, 270 Ill. App. 21 (1933) (statement to plaintiff's employer that plaintiff had a "decided complex"); Moore v. Francis, 121 N.Y. 199, 23 N.E. 1127 (1890) (statement that plaintiff, a bank clerk, suffered mental derangement). See also Capp v. Watts, 271 S.C. 276, 246 S.E.2d 606 (1978).
We conclude, therefore, that there was evidence from which a jury properly could have found that Eastern, through its agent Ashlock, made a defamatory statement about Gellert which injured him in his occupation as a pilot for which Eastern could be held liable to Gellert for compensatory damages.
Eastern's argument that the award of punitive damages to Gellert cannot be sustained by the proof proceeds on two separate and distinct grounds, only one of which deserves our attention. Eastern correctly contends that the record is devoid of evidence that Eastern, Ashlock's employer, was at fault, a necessary ingredient to the assessment of punitive damages against Eastern. See Mercury Motors Express, Inc. v. Smith, 393 So.2d 545 (Fla. 1981). To be sure, Gellert introduced no proof from which reasonable-minded jurors could conclude *929 that Eastern knew or should have known that Ashlock, its employee, would defame Gellert, see Life Insurance Company of North America v. Del Aguila, 417 So.2d 651 (Fla. 1982), or that Ashlock was ill-trained for his position by Eastern, see Preventive Security and Investigators, Inc. v. Troge, 423 So.2d 931 (Fla. 3d DCA 1982), or lacked appropriate supervision by Eastern, see Petrites v. J.C. Bradford & Co., 646 F.2d 1033 (5th Cir.1981), or that Ashlock was negligently hired by Eastern, see Petersen v. K-Mart Corp., 402 So.2d 1215 (Fla. 5th DCA 1981), rev. denied, 412 So.2d 467 (1982), or that in some other manner Eastern departed from some standard of care or did anything which foreseeably contributed to an injury suffered by Gellert. Therefore, under Mercury Motors Express, Inc. v. Smith, 393 So.2d 545, Eastern cannot be held punitively liable for the conduct of Ashlock. Gellert's alternative claim that Eastern is liable for punitive damages because of its own willful misconduct fares no better, because there is simply no proof in the record that Eastern induced, directly authorized or ratified Ashlock's statement.
This failure of proof is readily explained by the fact that the trial of this case occurred in 1980, before the Supreme Court's decision in Mercury Motors. At the time of trial, the law in this district was that "a jury may assess punitive damages against a corporate employer when its employee, acting within the scope of his employment, has been guilty of willful and wanton misconduct, ..." Mercury Motor Express, Inc. v. Smith, 372 So.2d 116, 117 (Fla. 3d DCA 1979). But where a change in the state of the law occurs between trial and appeal, we are bound to apply the law as it exists at the time of appeal. Hendeles v. Sanford Auto Auction, Inc., 364 So.2d 467 (Fla. 1978); Florida East Coast Railway Co. v. Rouse, 194 So.2d 260 (Fla. 1967). Since independent proof of Eastern's fault is now required and no such proof was adduced, the punitive damage verdict against Eastern cannot stand.[3]
We are quick to point out, however, that Eastern does not receive a windfall merely because the law has changed between trial and appeal. See Hendeles v. Sanford Auto Auction, Inc., 364 So.2d 467; Florida East Coast Railway Co. v. Rouse, 194 So.2d at 262; Winter Park Golf Estates, Inc. v. City of Winter Park, 114 Fla. 350, 153 So. 842 (1934); Melick v. Melick, 393 So.2d 1186 (Fla. 1st DCA 1981). Gellert had a right to rely on the law which was in force when the case was tried, and in 1980 there was no need for him to prove independent fault on Eastern's part. He will have an opportunity to do so upon the retrial of this case, which, as will be seen, is necessitated by a defect in the jury selection process.
In the jury selection process, the clerk selected twelve persons from an undisclosed number of prospective jurors seated in the courtroom. After the court and both counsel had questioned the initial twelve prospective jurors, and after the court had announced that four of them would be excused for cause, counsel were called to the bench and informed that "there will be no more questions at this time." The court further informed counsel that they would at that point be required to exercise all of their allotted peremptory challenges which they wished to exercise, and there would be no further opportunity afforded the parties to exercise any peremptory challenges. Eastern's counsel objected to this procedure on the ground that there were only eight available prospective jurors of the ones who had been examined on voir dire and that he should not be required to exercise or forego all his peremptory challenges without an *930 available panel of twelve prospective jurors in the box. This objection was overruled, whereupon, apparently in accordance with the customary practice of the court, counsel for both parties submitted slips of paper bearing the names of the three prospective jurors whom each challenged peremptorily. The name of one such prospective juror appeared on both lists, resulting in only five prospective jurors being excused by peremptory challenges. This left remaining in the jury box only three of the original twelve who had been questioned. Three additional prospective jurors were seated. One of them, a juror named Hall, disclosed in response to the court's questioning that in 1972 he had brought a claim for personal injuries, but "it went to a jury and they granted me zero." When asked if he harbored any ill feelings against the court system, he responded affirmatively, stating that he did not believe in the jury system. Nonetheless, upon further questioning, he stated that his experience would not "spill over" into this case and that he could put it aside and be fair and impartial. Eastern's counsel then again voiced objection to the manner in which he had been required to exercise peremptory challenges, pointing out that he had been required to do so before ever having the opportunity to question the replacement prospective jurors. He then sought to challenge prospective juror Hall for cause, and when that challenge was denied, he requested from the court an additional peremptory challenge with respect to the three new jurors who had been called to the jury box. This request was also denied, the trial court stating that the procedure of having only eight available jurors at the time of requiring all peremptory challenges to be exercised "does not violate any rule of procedure."
Two important principles are here involved, namely the broad discretion vested in the trial court to control the manner in which peremptory challenges are to be exercised, Peri v. State, 426 So.2d 1021 (Fla. 3d DCA 1983); Barker v. Randolph, 239 So.2d 110 (Fla. 1st DCA), cert. denied, 242 So.2d 137 (Fla. 1970); Gafford v. Star Fish & Oyster Co., 475 F.2d 767 (5th Cir.1973), and the right of a litigant to have a fair opportunity to make an intelligent judgment as to the exercise of the peremptory challenges guaranteed to him by law, see Loftin v. Wilson, 67 So.2d 185 (Fla. 1953); Ritter v. Jimenez, 343 So.2d 659 (Fla. 3d DCA 1977); Minnis v. Jackson, 330 So.2d 847 (Fla. 3d DCA 1976); Saborit v. Deliford, 312 So.2d 795 (Fla. 3d DCA 1975), cert. denied, 327 So.2d 32 (Fla. 1976); Ellison v. Cribb, 271 So.2d 174 (Fla. 1st DCA 1972), cert. denied, 272 So.2d 160 (Fla. 1973); Barker v. Randolph, 239 So.2d 110.
Eastern was not, as it urges, entitled to have four additional prospective jurors placed in the jury box and submitted to voir dire examination before it was required to exercise any of its challenges. As pointed out by the trial judge, the parties were at that point better off than if only six prospective jurors had been placed in the jury box initially, with four more called to replace the four who had been excused for cause. Thus, there was neither error nor abuse of discretion in denying Eastern's request in this respect. On the other hand, we do find that the trial court abused its discretion in requiring counsel to exercise all peremptory challenges that they expected to exercise at a time when there were only eight prospective jurors in the jury box, because, as was quite clearly foreseeable and indeed occurred here, the exercise of such peremptory challenges would leave fewer than six prospective jurors in the box, thereby depriving Eastern of a fair opportunity to make an intelligent judgment as to the manner in which it should exercise its peremptory challenges. While Gellert argues that Eastern should have reserved at least one challenge to exercise against the prospective jurors called to fill the vacant seats, that argument overlooks the very essence of the court's order, that is, that no further opportunity would be afforded the parties to exercise peremptory challenges.[4]
*931 Thus, the court, while granted discretion over the manner in which challenges are exercised, must exercise that discretion so as not to violate the litigant's right to have a fair opportunity to make an intelligent judgment as to exercise of peremptory challenges. See, e.g., Poole v. State, 194 So.2d 903 (Fla. 1967) (error for court to refuse to permit questioning regarding mercy recommendations); Barker v. Randolph, 239 So.2d 110 (error for court to refuse plaintiff to resume questioning once panel was tendered to defendant). Here, by whatever manner the initial peremptory challenges were exercised, once the number of prospective jurors who had been examined on voir dire was reduced to less than the six required for the trial of this case, additional prospective jurors should have been seated and subjected to voir dire, after which further opportunity for exercise of peremptory challenges should have been permitted, and the process continued until counsel either exhausted their respective peremptory challenges or, having challenges left, voluntarily relinquished them and accepted the jury.
By this opinion, we do not condemn the general procedures which the court contemplated using at the outset of the case, that is, to select twelve prospective jurors, numbered one to twelve respectively, who, after a reasonable opportunity for voir dire examination by the parties, would become the panel from which the jury was selected, those with the six lowest numbers after the exercise of peremptory challenges becoming the jury. The system chosen ran into difficulty only because some prospective jurors were excused for cause. The same technique with a slightly larger original panel (thus allowing for depletion due to excuses for cause, and thereby eliminating any probability of additional prospective jurors being called to the box after all peremptory challenges had been exhausted) would adequately protect the litigant's rights without interfering with the exercise by the court of its sound discretion in the manner in which challenges are to be exercised.
Accordingly, we reverse the judgment under review and remand the cause for a new trial.
Reversed and remanded.
FERGUSON, Judge (concurring in part and dissenting in part).
Judge Pearson has prepared for the court a very thoughtful opinion on the issues presented. This partial dissent is filed because I disagree only with his treatment of the punitive damage question.
A jury found, apparently, that as public spokesman for Eastern, Ashlock could by his public statements make the corporation liable for punitive damages. The majority reverses, holding that Ashlock is not Eastern, and suggesting that there must be some act of negligence on the part of a person higher than Ashlock in the organizational structure in order to make Eastern liable for punitive damages. The majority relies on Mercury Motors v. Smith, 393 So.2d 545 (Fla. 1981) as support for this holding.
The opinion of the Florida Supreme Court in Mercury Motors is not dispositive of the question presented here, for in that case, the corporate actor was a low-level truck driver, and the tort was a wrongful death caused by the negligent operation of his vehicle. Mercury Motors did not answer the question of whose acts constitute the acts of the corporate employer. It is axiomatic that a corporation can act only through its agents (cites omitted). Query, at what level of the organizational scheme, if at any, is an agent deemed a corporate actor for the purpose of assessing punitive damages against the corporation where the agent acts maliciously within the course and scope of his corporate duties?
Although there is no direct evidence on the point, it can be inferred, based on the *932 authority exercised by him, that Ashlock has considerable responsibility for the corporation's public relations function. To the extent that the majority holds, as a matter of law, that no corporate officer or employee can by his own wanton and malicious act trigger corporate liability for punitive damages, I would disagree. Whether a particular corporate position carries with it such responsibility as to make the position-holder the corporation in the doing of a particular act is, in my opinion, a question of fact to be decided by the jury.
OWEN, WILLIAM C., Jr., Associate Judge, concurring in part and dissenting in part;
While I concur that the judgment should be reversed, I would remand to the trial court with instructions to enter judgment in favor of appellant on the holding that, as a matter of law, the alleged defamatory statement was not one of fact, but was merely a statement of pure opinion as to which no cause of action will lie.
There is no objective standard by which one can be shown to be paranoid. Thus, a statement that one is "paranoid" is necessarily a statement of opinion. For example, if the truth of the statement was an issue to be determined by the trier of fact, surely the proof would be made solely by opinion testimony of expert witnesses. How can it be said, then, that a lay person, using the term "paranoid" in its more commonly understood meaning to describe another, has made such statement as one of fact rather than one of opinion.
My dissent extends only to the foregoing issue. On all other issues I fully concur in the majority opinion.
NOTES
[1] Since 1972, there has been an ongoing controversy between Eastern and Captain Gellert, an Eastern pilot. The details are not essential to our disposition of the case, but for anyone interested, some of these matters are discussed in Gellert v. Eastern Air Lines, Inc., 370 So.2d 802 (Fla. 3d DCA 1979), cert. denied, 381 So.2d 766 (Fla. 1980), and Eastern Air Lines, Inc. v. Gellert, 431 So.2d 329 (Fla. 3d DCA 1983).
[2] Where a statement casts aspersions on someone's mental fitness, but is not made in connection with that person's business or profession, a distinction is drawn between written and oral statements. A printed statement which derogates the plaintiff's mental condition has been held to be libelous per se. See Cowper v. Vannier, 20 Ill. App.2d 499, 156 N.E.2d 761 (1959) (statement in newspaper that plaintiff was recovering from mental illness); Kenney v. Hatfield, 351 Mich. 498, 88 N.W.2d 535 (1958) (paid printed political advertisement by judge justifying commitment of plaintiff); Wemple v. Delano, 187 Misc. 710, 65 N.Y.S.2d 322 (1946); Moore v. Francis, 121 N.Y. 199, 23 N.E. 1127 (1890). However, an oral statement which imputes impairment of a person's mental faculties is not slander per se. See Modla v. Parker, 17 Ariz. App. 54, 495 P.2d 494, cert. denied sub nom. Modla v. Southside Hospital, 409 U.S. 1038, 93 S.Ct. 516, 34 L.Ed.2d 487 (1972). See generally 53 C.J.S. Libel and Slander § 25 (1948).
[3] Gellert says in his cross-appeal that if he failed in his proof, that failure resulted from the trial court's erroneous exclusion of evidence offered by him. Since Eastern's independent fault was not an issue in the 1980 trial, we leave it to the trial court on retrial of this case to examine the proffered evidence in light of this new issue. Of course, even had Gellert proved fault on Eastern's part, the jury was instructed on the law as it existed in 1980, that is, that if Ashlock acted maliciously, it could assess punitive damages against Eastern. The instruction itself would mandate reversal of the punitive damage award under the present state of the law.
[4] Of course, where a party voluntarily exercises all peremptory challenges to which he is entitled, as a result of which there are fewer prospective jurors in the box than required to fulfill the jury complement, he cannot be heard to complain that he has then no opportunity to exercise peremptory challenges against the entire panel, including a replacement prospective juror.