476 So.2d 696 (1985)
CEDARS OF LEBANON HOSPITAL CORPORATION, et al., Appellants,
v.
Orlando SILVA, M.D., et al., Appellees.
Ruben GURVICH, M.D., et al., Appellants,
v.
Orlando SILVA, M.D., et al., Appellees.
Orlando SILVA, M.D., As Personal Representative of the Estate of Maria Teresa Silva, Deceased, Appellant,
v.
CEDARS OF LEBANON HOSPITAL CORPORATION, a Florida Corporation, et al., Appellees.
Nos. 80-1996, 81-675, 80-2027 and 81-732.
District Court of Appeal of Florida, Third District.
September 10, 1985.
Rehearing Denied October 29, 1985.
*697 Blackwell, Walker, Gray, Powers, Flick & Hoehl and James E. Tribble; Perkins, Vickers & Collins, Tallahassee; Lanza, Sevier & Womack, Coral Gables, for appellants/cross-appellees Cedars of Lebanon Hosp. Corp., Ambassador Ins. Co., and Florida Patients' Compensation Fund.
Spence, Payne, Masington & Grossman; Podhurst, Orseck, Parks, Josefsberg, Eaton, Meadow & Olin and Joel D. Eaton, Miami, for appellee/appellant Orlando Silva, M.D.
Preddy, Kutner & Hardy and G. William Bissett, Miami, for appellants/appellees Ruben Gurvich, M.D. and Steiner and Munach, P.A.
Thornton & Herndon and John W. Thornton and Jane E. Thornton, Miami, for appellee/cross-appellant Raquel Cruz, M.D.
Before NESBITT, DANIEL S. PEARSON and FERGUSON, JJ.
DANIEL S. PEARSON, Judge.
This case began when Orlando Silva, as personal representative of the estate of his deceased wife, Maria Teresa Silva, and on behalf of their four minor children,[1] brought an action against multiple defendants claiming that medical malpractice committed by the defendant doctors and hospital personnel during surgery caused Mrs. Silva to suffer irreversible brain damage eventuating in her death. More specifically, Silva claimed that Dr. Ruben Gurvich, the attending anesthesiologist, while acting in the course and scope of his authority as an agent and employee of Steiner and Munach, P.A., was negligent in his administration of anesthetic treatment and care; that Dr. Raquel Cruz, the surgeon, was negligent in her failure to take appropriate and expeditious remedial action; and that Cedars *698 of Lebanon Hospital (and its liability insurers, Ambassador Insurance Company and Florida Patients' Compensation Fund) was itself liable for the negligent action and inaction of its operating room personnel, and was, as well, vicariously liable for Dr. Gurvich's negligence.[2]
After more than three weeks at trial, the jury returned a special interrogatory verdict in which it found that Dr. Gurvich was the agent of Cedars[3]; that the legal cause of Mrs. Silva's death was negligence on the part of Cedars and Dr. Gurvich; that no negligence on the part of the surgeon, Dr. Cruz, or on the part of the plaintiff, Silva, contributed to Mrs. Silva's death; and that Dr. Gurvich's and Cedars' negligence contributed to Mrs. Silva's death in the amount of ninety per cent and ten per cent, respectively.
The jury went on to assess the damages. Because certain events which may have affected the jury's damage awards form the central issue on appeal, we here set forth in haec verba the portion of the verdict relating to damages:
"III. DAMAGES
"(7) We, the Jury, find that Orlando Silva, M.D. is entitled to the following damages for his wife's Hospital and Funeral Bill:

 HOSPITAL BILL $442,537.50
 FUNERAL BILL $ 5,075.20

"(8) We, the Jury, find the following damages for Orlando Silva, M.D. for mental pain and suffering and loss of companionship:

 PAST DAMAGES $ 50,000
 FUTURE DAMAGES $ 15,000

"(8.A.) We, the Jury, find the following damages for Orlando Silva, M.D. for past support and services: $200,000.
"(9) We, the Jury, find the following damages for Orlando Silva, Jr. for mental pain and suffering, loss of parental instruction and guidance, and loss of parental companionship:

 PAST DAMAGES $ 25,000
 FUTURE DAMAGES $ 500.00

"(10) We, the Jury, find the following damages for Teryliz Silva for mental pain and suffering, loss of parental instruction and guidance, and loss of parental companionship:

 PAST DAMAGES $ 25,000
 FUTURE DAMAGES $ 650.00

"(11) We, the Jury, find the following damages for Carlos Silva for mental pain and suffering, loss of parental instruction and guidance, and loss of parental companionship:

 PAST DAMAGES $ 25,000
 FUTURE DAMAGES $ 1,000

"(12) We, the Jury, find the following damages for Jorge Silva for mental pain and suffering, loss of parental instruction and guidance and loss of parental companionship:

 PAST DAMAGES $ 25,000
 FUTURE DAMAGES $ 1,000"

Several days after the verdict was rendered, Silva filed a motion to interview the jurors pursuant to Florida Rule of Civil Procedure 1.431(g) and, simultaneously, a motion to interview the bailiff and a motion for new trial on damages only. The motions to interview were supported by Silva's *699 own affidavit and those of his oldest son, his trial counsel, and others connected with the law firm representing him. The motions and affidavits recited that some of the jurors had publicly stated shortly after the trial that they had intended to award larger amounts of future damages for the minor children, that they were confused by the judge's instructions on future damages, and, most significantly, that they had requested the bailiff to let them ask the judge for clarification of the instructions, but that their request had been refused. Over the defendants' objections, the trial court granted the motions to interview, and two hearings in chambers ensued, at which, with all counsel present, five of the six jurors and the bailiff were questioned. Thereafter, based on what this questioning revealed, the trial court entered its order granting Silva's request for a new trial on damages only. The post-trial motions of Dr. Gurvich and Cedars were denied, and they appealed.[4]
We turn now to the propriety of the interview of the jurors, a central component of the trial court's decision to limit the new trial to the issue of damages. According to the affidavits in support of the motions to interview the jurors and the bailiff, these motions were prompted by the following events. After the return of the verdict, Stuart Grossman, one of Silva's attorneys, left the courthouse and saw one of the jurors speaking to a reporter from the Miami Herald. Mr. Grossman walked over and heard the juror tell the reporter that the jurors were confused about the verdict; they thought the money awarded was a monthly amount to be multiplied, and, despite an earlier admonition to them by the trial judge that he would not be their "pen pal," they had tried to speak to the judge about their confusion, but the bailiff refused to let them speak to the judge. Mr. J.B. Spence, another of Silva's attorneys, and Dr. Silva came over and heard this too. A few minutes later, three other jurors came back from their cars and said they needed to see the judge, as they had made a mistake. This all occurred late on a Friday, and the judge had already left the courthouse. Mr. Spence told the jurors to try calling the judge Saturday or Monday. An article concerning the jurors' confusion appeared in the Miami Herald, and an interview of one of the jurors by a television news reporter appeared on television.
The trial judge agreed to conduct interviews, to be limited, in his words, to "the isolated issue as to whether or not they [the jurors] were confused and whether or not they made a request to the bailiff to convey a message to the Judge, counsel, or whoever, if they in fact wanted to convey a message." At the interviews, five of the six jurors and the bailiff gave their versions of what occurred. The foreperson stated that at the end of deliberations, when she knocked on the door to tell the bailiff that they were ready to return the verdict, one of the jurors told the bailiff that the jury was not sure about the money verdict; two other jurors agreed with this juror and said they would like to clear it up, but the bailiff told them they "could not talk to the Judge at this point." According to the foreperson, the verdict form was already filled out and signed at the time of this conversation with the bailiff. The foreperson also said that when the verdict for the first listed child, Orlando, Jr., was read, she overheard one juror say something like "that sure doesn't seem like much."
Another juror testified that some jurors asked the bailiff about the damages and told him that they were confused, and the bailiff told them not to worry about it. A third juror stated that all the jurors were confused about how the money was to be *700 computed, and they asked the bailiff if they could speak to the judge, and the bailiff told them they could not. This juror said that the verdict form had not been signed and that they had not yet reached a verdict when they spoke to the bailiff. A fourth juror testified that after the verdict form had been filled out, they asked the bailiff if they could talk to the judge about the money part "on the sheet," and the bailiff told them not to worry about it. This juror claimed that the jurors had not asked to speak to the judge earlier "because we understood we were not supposed to talk to him while we were in deliberation... ." She said that she had come to that understanding because "[t]hat's what was told us before we went  while we were in the court room... . He [the judge] told us that we were not to  what was it he said? He was not our pen pal while we were in there." She also said the only problem they had was with the children's future damages, not with Dr. Silva's damages, past or future.
The fifth juror testified that the jurors told the bailiff they had a problem, to which the bailiff responded that the judge was in his office and that the jurors should worry only about the guilty or not guilty portion of the verdict. She stated the verdict form had not been signed at the time of this communication. She added that she was afraid to say anything after the jurors had re-entered the courtroom to return their verdict.
The trial court entered its Order Granting Plaintiff a New Trial on Damages. In pertinent part that order reads:
"The impropriety of the jury verdict is demonstrated in several different ways by this record, each of which provide [sic] an equally compelling reason for ordering a retrial on the issue of the plaintiff's damages. It is readily apparent that some of the jurors sought the assistance of the court to ally [sic] their apparent confusion concerning how to assess the future damages of the plaintiff's children; but had not reduced the question to written form and did not clearly indicate to the bailiff that they had a question for the Judge, this was not transmitted to the Court. The denial of that opportunity was most likely unintentional and the result of a simple misunderstanding of the nature of the jury's problem by the bailiff, but the denial nevertheless clearly occurred. The jury may also have been misled somewhat by the Court's admonitions to them that it would not be their `pen pal'. The Court did not mean by these remarks to foreclose completely the jury's right to submit questions to it if they needed further instructions; it only intended to discourage unnecessary communication to it.
"It is apparent from the testimony of at least one juror, however, that the jury misunderstood these remarks as barring questions altogether, and it is probable that the jury did not press their demands upon the bailiff as a result.
"The Court need not decide exactly what transpired, however, nor need it decide the precise reasons for the lack of communication between the jury and the court, because it is clear that, for whatever reason, the jury was improperly denied the right to seek the assistance of the Court and counsel in dissipating their confusion concerning how to assess the future damages for the children; one juror stated they had no question concerning future damages for Dr. Silva. The Court further finds that counsel for Plaintiff and Defendants did not fully and in a precise manner, explain to the jury in final argument, how and in what manner they were to compute future damages, if any they found. Because of the combination of circumstances set forth above, and the jury's verdict with respect to the future damages of the Plaintiff's children the verdict cannot be considered a proper one.
"It is clear that the jurors were confused as to how they were to calculate the future damages of the Plaintiff's children, and that the extremely small sums awarded to the Plaintiff's children were predicated either upon a failure to consider all of the various factors which *701 should have been taken into consideration in assessing future damages of the children or upon a misunderstanding of the Court's instructions, or both. This confusion is manifest from the face of the verdict itself, in which the jury awarded substantial past damages and incomprehensibly nominal future damages for periods far in excess of the period over which the past damages were to be computed. This confusion is also manifested by the uncontradicted testimony of the jurors, each of whom indicated in one form or another that they were confused concerning the element of the future damages for the children.
... .
"The Court considers that the future damages awarded to the Plaintiff's children, standing by themselves, were grossly inadequate and against the manifest weight of the evidence. The evidence adduced at trial demonstrated that the Plaintiffs would sustain substantial future damages in the form of mental pain and suffering, loss of spousal and parental companionship, and loss of parental instruction and guidance. When the awards are measured against the uncontradicted life expenctancies [sic] of the various children and the life expectancy of the decedent, it is clear that the decedent's husband was awarded approximately Five Hundred ($500) Dollars per year for his future damages, and that the decedent's children were awarded in the neighborhood of Twenty ($20) Dollars to Twenty Five ($25) Dollars per year for their future damages. These amounts awarded to the children are disturbing to the conscience of the Court in view of the evidence adduced in support of the future damages of the Plaintiff's children, and it is clear that the Plaintiff's children will suffer considerably more than the incomprehensibly nominal damages which were awarded to them.
"The Court does not merely disagree with the amounts awarded by the jury. Rather the Court is convinced that no jury of reasonable persons could render the awards of future damages rendered by the jury in the instant case in light of the evidence, and that the jury's verdict with respect to the future damages awarded to the children of the Plaintiff therefore cannot be approved and reduced to judgment.
"The Court has considered the Plaintiff's request that the new trial be limited solely to the issues of the future damages of the Plaintiff's beneficiaries, but it has concluded that the issues of past damages and future damages are inextricably intertwined in a jury's deliberations, and that it would be unfair to the Defendants for the Court to approve the past damages awarded to the Plaintiff and submit only the issues of future damages to a separate jury.
"In addition, a retrial of the Plaintiff's damages will necessarily have to be held in the future, and the past damages awarded to the Plaintiff will necessarily become only partial past damages to the new jury, which will be required to assess additional past damages from the date of the first verdict to the date of the second verdict, all of which will add unnecessary and possibly prejudicial confusion to the retrial of the damage issues.
"The Court is mindful that one juror stated that they had no questions with the amounts awarded Dr. Silva. This is further indicated by the Bailiff's abbreviated response to Plaintiff's question. The curtailed answer being to the effect that a juror volunteered that the jury had no question on damages awarded Dr. Silva.
"The Court, in weighing the limitations of Defendants' opportunity to offer testimony on the alleged statements of Dr. Silva's remarriage to his lady friend will submit the past and future damage, if any, of Dr. Silva to the jury and reconsider the exclusion of Defendants' proffered testimony, upon appropriate motion. Accordingly, a new trial is required on all the damage issues.
"The Court has also carefully considered the Defendants' requests that any new trial include a retrial of the *702 liability issues in this case. The issues of liability and damages were submitted separately to the jury; however, the jury was clearly admonished by the Court in its instructions that the issues were to be considered separately. It is readily apparent from the verdict itself that the issues were considered separately by the jury, and that the verdict is not a `compromise' verdict, since the jury awarded the Plaintiff's estate all of its medical and funeral expenses, and the jury's awards of past damages were substantial.
"In addition, the Defendants have pointed to nothing in the record which could possibly cause this Court to question the reliability of the jury's verdict on liability, and none of the jurors interviewed expressed any confusion concerning their assessment of liability. Rather, the only confusion which surfaced in the juror interviews related to confusion concerning the assessment of future damages. This case took a full three weeks to try and involved expenditures of both time and money by all parties. Retrying the liability issues will undeniably double these expenditures, and the Court is reluctant to require a retrial of the liability issues as a result  absent a demonstration that the jury's verdict on liability is improper in some respect, which has not been made by the Defendants. All things considered, the Court concludes that the liability issues were fully and fairly tried; that the verdict returned by the jury reflects a thoughtful and careful analysis of the liability issues, separate from the damage issues; that the verdict on liability is amply supported by the evidence; that, in the absence of any reason appearing in the record to disturb the verdict on liability, the court should not disturb it; and that no useful purpose would be served by retrying the liability issues in this case."
... .
We affirm the order granting a new trial limited to damages.[5] In so doing, we reject the appellants' claims that the reasons given by the trial court for granting a new trial on damages militate in favor of a new trial on liability as well and that a new trial on liability is warranted on other independent grounds.
Appellants do not dispute that the trial court's factual findings based on the post-trial interviews are fully justified by the evidence or that interference with a jury's right to ask questions of, and be instructed by, the court provides a sound legal basis for the grant of a new trial. See Blancher v. Metropolitan Dade County, 436 So.2d 1077 (Fla. 3d DCA 1983) (clerk's failure to communicate jury's desire to ask court question to clear up confusion approved as proper ground for new trial); Ford v. Nathan, 166 So.2d 185 (Fla. 1st DCA 1964). The appellants urge, however, that the interviews which produced the facts upon which the new trial order was bottomed were an impermissible inquiry into the deliberative process of the jury about matters which "inhere in the verdict."
It is, of course, a well-settled proposition that jurors may be examined only upon matters "extrinsic to the verdict" and not upon matters concerning the jury's intent or the deliberative process which "inhere in the verdict." See, e.g., Marks v. State Road Department, 69 So.2d 771 (Fla. 1954); Raidle Cook Insurance, Inc. v. American States Insurance Co., 437 So.2d 184 (Fla. 4th DCA 1983); Fitzell v. Rama Industries, Inc., 416 So.2d 1246 (Fla. 4th DCA 1982). Obviously, inquiry about the bailiff's statements to the jurors that they could not communicate with the judge, being "extrinsic to the verdict," is perfectly permissible. While inquiry into the nature of the questions that the jurors would have posed to the judge had they not been precluded by the bailiff's response is arguably an inquiry into the *703 jurors' deliberative process, it is nonetheless permitted where it is used to determine whether the independently demonstrated legal error  here, precluding the jurors from communicating with the court  was harmful. See Crapps v. Murchek, 330 So.2d 173 (Fla. 4th DCA 1976); Ellison v. Cribb, 271 So.2d 174 (Fla. 1st DCA 1972), cert. denied, 272 So.2d 160 (Fla. 1973). See also State v. Blasi, 411 So.2d 1320 (Fla. 2d DCA 1981). With rare exceptions not applicable here, whether relief is granted in the face of error depends upon the harm caused by the error. But the harm here, if any, cannot be determined without inquiry into the precise context of the attempted communication. For example, if the jury had been barred from asking the judge about their accommodations or like matters immaterial to any issue in the case, the error would likely be deemed entirely harmless, since the judge's response or lack of response would have no impact on the jury's verdict. In contrast, had the jury's attempted communication concerned a question of the applicable standard of care for a physician, a new trial on liability might have been appropriate. Here, where the clear evidence is that the thwarted communication was intended solely to dissipate the jury's confusion on the damage issue, and the inadequacy of the verdict on future damages reflected this confusion, it can be said that the harm caused by the bailiff's refusal to let the jury communicate with the judge was limited to the damage portion of the verdict and that, therefore, the new trial order was properly so limited.
A second basis for the grant of the new trial was the trial court's admonition to the jury that it could not be the jury's "pen pal." On three occasions, once during its opening instructions, once during trial, and once in its closing instructions, the trial court instructed the jury that it could not become its "pen pal" and that it did not wish to influence it during its deliberations by answering questions. During the closing instructions, the following occurred:
"THE COURT: ... Any questions on this at all, then? Now is the time to ask them because, as I have noted to you, I can't become a pen pal of yours.
"JUROR NO. 5: What about the amount of money?"
Without exploring the nature of the confusion evinced by this question, the trial court read the verdict form again and sent the jury out to deliberate. According to one juror, she understood the court's statement to mean that the jurors were not supposed to talk to the judge at all and for that reason did not insist upon asking the judge a question despite their confusion.
Although in its new trial order the court indicated that it did not mean by its "pen pal" remarks to foreclose completely the jury's right to submit questions if they needed further instructions, and that the admonition was intended simply to discourage unnecessary communication with the court, it nonetheless found that the jury had been "misled" by the instructions and that the instructions played a part in preventing the jury from communicating to the court concerning the jury's confusion over the measure of future damages. Thus, by these admonitions, the trial court in effect prohibited the jury from asking it questions necessary to allay the jury's confusion. This error was clearly harmful to Silva, since the jury's unasked questions related to damages only, and the future damages awarded were grossly inadequate. It follows that the trial court, having found that it had virtually, although inadvertently, prohibited any questions by the jury, cannot be said to have abused its broad discretion in granting Silva's motion for new trial.
But even if, arguendo, the new trial order were, in part, impermissibly based on inquiry into the deliberative process, see Fitzell v. Rama Industries, Inc., 416 So.2d 1246, it is clear that the order before us is alternatively grounded on the unassailed proposition that the "future damages awarded to the plaintiff's children, standing by themselves, were grossly inadequate and against the manifest weight of the *704 evidence." This reason alone, in our view, provides ample support for the new trial order entered here. At the time of her death, Mrs. Silva was survived by her husband and four minor children. Her life expectancy, and therefore the joint life expectancies of herself and her children, was nearly forty years. The jury was instructed that it should compensate each child for loss of parental companionship, instruction and guidance, and mental pain and suffering for that period. Dr. Silva's life expectancy, and therefore the joint life expectancy of himself and his wife, was more than thirty years. The jury was instructed that it should compensate Dr. Silva for loss of his wife's companionship and protection and his mental pain and suffering for that period. The record reflects that the Silva family was exceptionally close and that Mrs. Silva was loved deeply by her husband and children. The record also reflects that each of the survivors suffered immensely from her loss, that each of them required psychiatric treatment after her death.
In the face of this evidence, the jury awarded Dr. Silva $50,000 for his past intangible damages and only $15,000, or approximately $500 per year, for his future intangible damages. The jury also awarded each of Mrs. Silva's children $25,000 for past intangible damages, and sums of from $500 to $1,000 for their future intangible damages. The awards of future damages to the children therefore range from $12.66 to $25.32 per year. The trial court found these future damage awards to be "incomprehensibly nominal" in light of the undisputed evidence of the immensity of the future loss.[6] Against this backdrop, it can hardly be said that the trial court abused its discretion in finding the future damage awards grossly inadequate and against the manifest weight of the evidence.
The appellants urge, however, that if a new trial is warranted, the new trial should be on both liability and damages. Our standard of review is, of course, whether the trial court abused its discretion in limiting the new trial to the issue of damages instead of ordering that the entire case be tried. See Central Taxi Service, Inc. v. Greenberg, 418 So.2d 333 (Fla. 3d DCA 1982). See also Sosa v. Knight-Ridder Newspapers, Inc., 435 So.2d 821 (Fla. 1983); Baptist Memorial Hospital, Inc. v. Bell, 384 So.2d 145 (Fla. 1980); Avis Rent-A-Car Systems, Inc. v. Garmas, 440 So.2d 1311 (Fla. 3d DCA 1983), rev. denied, 451 So.2d 848 (Fla. 1984); Salkay v. State Farm Mutual Automobile Insurance Co., 398 So.2d 916 (Fla. 3d DCA), rev. dismissed, 402 So.2d 612 (Fla. 1981); Jones v. Airport Rent-A-Car, Inc., 342 So.2d 104 (Fla. 3d DCA 1977).
There is no disagreement among the parties that a partial new trial limited to a single issue is inappropriate when the new trial is necessitated by some error at trial which has prejudiced the jury broadly on all issues. See, e.g., Porter v. Gordon, 46 So.2d 19 (Fla. 1950); Deese v. Whitebelt Dairy Farms, Inc., 160 So.2d 543 (Fla. 2d DCA 1964). In the present case, however, it is abundantly clear that the only reasons requiring a new trial were the jury's confusion on the single issue of damages sustanied by the plaintiff's beneficiaries, and the erroneous failure of the trial court to entertain the question which the jury had concerning its confusion on this single issue. No prejudice affecting the jury generally on all issues is even suggested by the record in this case. Similarly, the parties agree that a new trial on a single issue is inappropriate where the issue is interrelated with another issue or is not separable from another issue.[7]See, e.g., Remsberg v. *705 Mosley, 58 So.2d 432 (Fla. 1952); Radiant Oil Co. v. Herring, 146 Fla. 154, 200 So. 376 (1941). Compare Brinson v. Howard, 71 So.2d 172 (Fla. 1954) (explaining Remsberg, supra); Eggers v. Narron, 254 So.2d 382 (Fla. 4th DCA 1971), cert. discharged, 263 So.2d 213 (Fla. 1972) (approving decision); Roemelmeyer v. Richard A. Marshall Insurance Agency, 223 So.2d 753 (Fla. 3d DCA 1969). Again, the record before us does not support any claim that the issues of damages and liability were either interrelated or inseparable.
Moreover, Silva concedes that when, as here, a new trial is ordered because of an inadequate damage award, a retrial should not be restricted to damages if there is strong reason to suspect that the verdict is a "compromise verdict." See 1661 Corp. v. Snyder, 267 So.2d 362 (Fla. 1st DCA 1972); Rodriguez v. Allgreen Corp., 242 So.2d 741 (Fla. 4th DCA 1971); Duquette v. Hindman, 152 So.2d 789 (Fla. 1st DCA 1963). The present case, however, is not one where the evidence of the defendants' liability is tenuous, and where it thus appears that jurors who would have found no liability whatsoever compromised with those who would have found the defendants liable and, as a result of the compromise, together rendered a verdict for the plaintiff in an amount considerably less than the proof on damages warranted. Indeed, all that can be said about the liability issue in this case is that it was hotly disputed. It cannot, however, be said that the evidence that the defendants were liable was not substantial.[8],[9] As should be obvious, *706 *707 a new trial on liability is not required simply because that issue is disputed. See Fayden v. Guerrero, 474 So.2d 320 (Fla. 3d DCA 1985) (where error upon which new trial order was predicated related solely to damage issue, order granting new trial on liability reversed, notwithstanding that evidence on liability in conflict); E.T. Leggs & Associates, Ltd. v. Shamrock Auto Rentals, Inc., 386 So.2d 1273, 1274 (Fla. 3d DCA 1980), rev. denied, 392 So.2d 1379 (Fla. 1981) (new trial on damages only, notwithstanding that "the evidence presented on the issue of defendants' liability was conflicting"); Grand Union Co. v. Devlin, 213 So.2d 488, 489 (Fla. 3d DCA 1968) (new trial on damages only despite the fact that "case was vigorously and capably contested before the jury on the questions of liability and damages"). A substantial dispute about liability (which admittedly existed) is not the equivalent of insubstantial evidence of liability, and we reject the appellants' argument to the contrary.
We briefly dispose of the appellants' remaining points on appeal, any of which, they say, require a new trial on all issues. Having diligently examined the record in the trial court and the relevant authorities, and even assuming the dubious proposition that these alleged errors were properly preserved for our review, but see Sears Roebuck & Co. v. Jackson, 433 So.2d 1319 (Fla. 3d DCA 1983), we are of the view that the trial court did not abuse its discretion in its conduct and supervision of the jury voir dire, cf. Ter Keurst v. Miami Elevator Company, 453 So.2d 501 (Fla. 3d DCA 1984); Eastern Air Lines v. Gellert, 438 So.2d 923 (Fla. 3d DCA 1983), in limiting the number of expert witnesses to be called by the parties, or in refusing to grant appellants' several motions for mistrial made during the course of a long and *708 heated trial. We conclude further that the hospital's contention that it was entitled to a directed verdict on two of several theories of non-vicarious liability, even if meritorious on the facts,[10] is precluded by the "two-issue rule" which forecloses any complaint where the two issues were among several issues subsumed in the jury's general verdict finding the hospital negligent. Whitman v. Castlewood International Corp., 383 So.2d 618 (Fla. 1980); Colonial Stores, Inc. v. Scarbrough, 355 So.2d 1181 (Fla. 1978); Florida East Coast Railway Co. v. Gonsiorowski, 418 So.2d 382 (Fla. 4th DCA 1982). See Allstate Insurance Co. v. A.D.H., Inc., 397 So.2d 928 (Fla. 3d DCA 1981); Rosenfelt v. Hall, 387 So.2d 544 (Fla. 5th DCA 1980). The only remaining matter which, in our view, warrants specific mention is the appellants' contention that the trial court wrongfully precluded them from introducing testimony that Silva had told a prospective witness that he planned to get married. As the testimony was offered for the sole purpose of impeaching Silva's credibility on a collateral matter (on cross-examination, Silva had denied having made such a statement), we find no error in the trial court's discretionary ruling.[11] However, our conclusion on this issue is not intended to preclude the appellants upon the retrial on damages from offering such evidence substantively[12] or, under different circumstances, to impeach.
The orders and judgments under review are affirmed in all respects.
NOTES
[1] The children, referred to in the verdict set out infra, are Orlando Silva, Jr., Teryliz Silva, Carlos Silva and Jorge Silva.
[2] A number of defendants were dropped from the case as the suit progressed. The defendants remaining (and parties to this appeal in the capacity of appellants or cross-appellees or both) are Cedars of Lebanon Hospital Corp., Ambassador Insurance Company, Florida Patients' Compensation Fund, Ruben Gurvich, M.D., Steiner and Munach, P.A., and Raquel Cruz, M.D. With the exception of Dr. Cruz, the appellants, in most respects, urge the same points on appeal. Any separate claim of Dr. Gurvich and his employer, Steiner and Munach, P.A., will be referred to as Dr. Gurvich's; any separate claim of Cedars and its insurers will be referred to as Cedars'. Dr. Cruz was exonerated by the jury's verdict, and Silva wants her restored as a defendant only if a new trial on liability as well as damages is the result of this appeal. Dr. Cruz's co-defendants want her in as a potential joint tortfeasor if a new trial on liability is awarded.
[3] There was no dispute that Dr. Gurvich was the agent of Steiner and Munach, P.A., which was thus liable for Dr. Gurvich's negligence through the operation of respondeat superior.
[4] After the filing of the initial appeals, we remanded the cause temporarily to the trial court for entry of a final judgment on the jury verdict in favor of the defendant Dr. Cruz. The trial court thereupon entered final judgments in favor of Dr. Cruz on both the main claim and on the crossclaims of Cedars and others. Following the entry of those judgments, additional appeals were filed by Cedars, Dr. Gurvich, Dr. Cruz and Silva. All appeals have now been consolidated.
[5] Our affirmance of the order granting a new trial solely on the issue of damages renders moot the contention of the appellants and Silva that the judgment for Dr. Cruz should be reversed in the event that this court orders that there be a new trial on liability. We thus affirm the judgment in favor of Dr. Cruz.
[6] Silva suggests that the most probable explanation for the peculiar future damage awards is that the jury mistakenly believed that they were to make an "annual" award (to be multiplied by the joint life expectancy by the court), rather than a lump sum award for the entire future. This explanation is supported (but not confirmed) by information volunteered during the jury interviews.
[7] This principle was followed by the trial court in the present case when it refused to limit the new trial to the issue of the plaintiff's beneficiaries' future damages only  the only issue as to which the verdict was unacceptable. Instead, the trial court ordered a retrial of all of the damage issues because of the inseparability of the elements of past and future damages.
[8] Viewing the evidence most favorably for Silva, as we must, it reveals as to Gurvich's negligence the following:

When a pap smear taken of Mrs. Silva revealed "atypical cells," she was scheduled for an elective dilation and curettage and a cone biopsy; the surgery was to be performed by Dr. Cruz. Because the anesthesiologist from Steiner and Munach, P.A., who was scheduled to provide anesthesia to Mrs. Silva, was tied up elsewhere, Dr. Gurvich was paged by the hospital and asked to handle Mrs. Silva's anesthesia. Mrs. Silva was taken into the operating room at approximately 6:45 p.m. and prepared for surgery  and Dr. Gurvich began the administration of anesthesia five minutes later. Five minutes after that, Mrs. Silva was placed in the "lithotomy position" by the hospital's personnel preparatory to the surgery. At approximately 7:00 p.m., or ten minutes after Dr. Gurvich began administering the anesthesia, Dr. Cruz entered the operating room and began the operation. During the first incision, Dr. Cruz noted that Mrs. Silva's blood was darker than usual, a sign of oxygen deprivation. She told Dr. Gurvich of the color of the blood, and he responded that he knew and that he was having some difficulty ventilating her. Twenty to thirty seconds later, Dr. Cruz made a second incision and discovered that Mrs. Silva's blood and tissues were black. Neither Dr. Cruz nor her assistant, Dr. Escar (an employee of the hospital), could see Mrs. Silva's face during the surgery because of the drapes separating her from the surgical area.
When Dr. Cruz stood up from her position between Mrs. Silva's legs, she saw that Mrs. Silva was extremely cyanotic, that is, her face was blue from oxygen deprivation. In Dr. Cruz's words, she "panicked," and she left the operating room to seek the assistance of Dr. Silva, an internist, who was awaiting the outcome of his wife's surgery in a nearby lounge with several physician friends. She returned to the operating room with Dr. Silva and his friends; by that time, Mrs. Silva's heart had stopped, and resuscitation attempts were begun by the several people in the operating room. During the course of the resuscitation attempts, Dr. Silva asked Dr. Gurvich if the endotracheal tube (which was intended to provide an airway to Mrs. Silva's lungs for the introduction of oxygen during the surgery) was in the right place. (Although there is some evidence, mainly from Dr. Gurvich, that Dr. Silva "interfered" with the resuscitation attempts, there is abundant evidence that his actions in the operating room were appropriate. It is because of Silva's involvement in the operating room that the question of his contributory negligence was submitted to the jury.) Dr. Gurvich responded by removing the tube and then reintubating Mrs. Silva; within thirty seconds after the reintubation, Mrs. Silva's condition improved dramatically. Although subsequent efforts to restore Mrs. Silva's heartbeat were ultimately successful, her brain had suffered irreversible damage from at least ten minutes of oxygen deprivation. Qualified experts in the field of anesthesiology testified that Dr. Gurvich had improperly placed the endotracheal tube in Mrs. Silva's esophagus initially, or that the tube had slipped out of Mrs. Silva's trachea and into her esophagus when she was placed in the "lithotomy position," and Dr. Gurvich improperly failed to detect the repositioning. They further testified that Mrs. Silva was deprived of oxygen completely for a period long enough to destroy her brain and ultimately bring about her death.
Dr. Gurvich's defense, rejected by the jury, was that Mrs. Silva suffered a severe, unremitting bronchospasm (an involuntary contraction of the muscles surrounding the tracheal-broncho tube, not uncommon in asthmatics, which constricts the flow of oxygen to the lungs) which he simply could not overcome. There was expert testimony, however, that even if Mrs. Silva did suffer a bronchospasm as Dr. Gurvich claimed, the initial choice of anesthesia and Dr. Gurvich's subsequent treatment of the purported bronchospasm was a departure from reasonable standards of care. Finally, the evidence was undisputed that a bronchospasm of such severity was exceptionally rare and unheard of by any of the experts with this type of anesthesia. There was also evidence that the entries on Dr. Gurvich's chart (the predicate for his version of the events and many of which were made after the incident) were a "book case" of bronchospasm and were not believable. In short, Dr. Gurvich's defense turned primarily upon the credibility of his testimony that Mrs. Silva died from a condition so rare that none of the experts had ever observed it. Dr. Gurvich's credibility, needless to say, was severely eroded by evidence that he had approached Dr. Cruz after the lawsuit was filed, requested her help, and told her that he had a "flexible memory." Although the issue of Dr. Gurvich's liability may have been "hotly disputed," the jury's verdict against Dr. Gurvich was amply supported.
As to the hospital's negligence, it is undisputed that the hospital did not obtain a history from Mrs. Silva or conduct a physical examination of her within twenty-four hours of surgery, as its own rules required. All witnesses agreed that the omission of the history and physical was a glaring departure from standards of reasonable care and that the hospital's rules required that Mrs. Silva's surgery be cancelled because of the absence of the required history and physical. Although one of the nurses noted the omission prior to Mrs. Silva's surgery and brought it to the attention of her supervisor, the surgery proceeded.
The evidence also reflects that the hospital's operating room personnel negligently failed to detect Mrs. Silva's deteriorating condition and obtain expert assistance in resuscitating Mrs. Silva. One hospital rule required that make-up be removed from all surgery patients so that cyanosis could be detected more readily. The hospital's operating room personnel violated this rule, thereby masking the first physically observable symptoms of Mrs. Silva's oxygen deprivation. Detection of that vital warning signal was important, because the hospital had established a "code blue" team, staffed with persons with special expertise in cardiopulmonary resuscitation (CPR), whose function was to respond to all cardiopulmonary crises in the hospital and to fill the gaps in the competence levels of the various persons attending the patient at that time.
The hospital also published a "code blue" book which obligated all hospital employees to call the "code blue" team immediately upon detecting a patient in pulmonary distress. One of the symptoms requiring that a "code blue" be called was acute cyanosis. Although the hospital operating room personnel were aware of Mrs. Silva's cyanosis and deteriorating condition soon after it developed, none of them called the "code blue" team until one of the nurses finally pushed the code blue button in the operating room at 7:21 p.m., well after Dr. Cruz had obtained the assistance of Dr. Silva and at Dr. Silva's insistence. There was expert testimony that the operating room personnel's failure to monitor and detect Mrs. Silva's condition and to call a "code blue" much earlier was a departure from standards of reasonable care. The record also reflects that the "crash cart" located in the operating room for use by the "code blue" team was missing necessary drugs, that it was necessary to send to the pharmacy for drugs during the CPR attempt, and that this omission caused unnecessary delay in the CPR efforts and was a departure from standards of reasonable care. Lastly, the issue of the hospital's vicarious liability for the negligence of Dr. Gurvich was submitted to the jury on two theories: that Dr. Gurvich was the "apparent agent" of the hospital and that Dr. Gurvich was the "ostensible agent" of the hospital. There was abundant evidence supporting both theories.
According to Dr. Silva, he had no knowledge of how anesthesia services were provided to surgery patients at the hospital. He left selection of the anesthesiologist up to Dr. Cruz; she, in turn, told him that she would arrange for "one of the groups there" to handle it. At the time of Mrs. Silva's surgery there were only two "groups," consisting of a total of ten anesthesiologists, permitted by the hospital to provide anesthesia services. Except on one occasion, no one else was permitted to practice anesthesiology in the hospital. The hospital required that the two groups provide sufficient anesthesiologists to cover surgical operations scheduled in its ten operating rooms, and the hospital, not the group, actually assigned the anesthesiologists to the scheduled surgical operations. The hospital could also require one group to cover for the other when that necessity arose. The hospital provided the two groups with an office, telephones, electricity, parking spaces, secretarial assistance, and all necessary equipment, medical supplies, charts, clothing, and the like. The hospital billed its patients directly for the anesthesiologists' fees and required the anesthesiologists to follow the hospital's by-laws and rules and to provide services to charity patients. The hospital did not tell its patients that the anesthesiologists were "independent contractors," but rather gave patients a brochure that stated that the hospital provided anesthesia services; the hospital publicly advertised the same thing.
A surgeon requesting anesthesia services at the hospital could not designate a particular anesthesiologist, but could only select one of the two groups. Dr. Cruz designated Steiner and Munach, P.A. for Mrs. Silva's surgery, but she thought that both the group and the hospital were providing anesthesia services to her patient. Other hospital personnel thought the same. Mrs. Silva's written consent to the surgery and the administration of anesthesia was executed on a hospital form, and the name of the anesthesiologist was left blank. According to Dr. Capati, the anesthesiologist from Steiner and Munach who first had contact with Mrs. Silva, "it is not unusual to not put a specific name of an anesthesiologist, because it could be anyone, any one of the anesthesiologists in the hospital."
The night before the surgery, Dr. Capati visited Mrs. Silva and introduced herself as "Dr. Capati from the Department of Anesthesiology" or as "one of the anesthesiologists at Cedars of Lebanon." Dr. Capati was wearing a white coat over her surgical greens on which the words "Cedars of Lebanon" appeared. After taking a brief history from Mrs. Silva and engaging in a brief conversation, Dr. Capati left. It is undisputed that Dr. Capati and the Silvas were perfect strangers at the time and that neither the Silvas nor Dr. Capati discussed anything concerning employment of an anesthesiologist.
Prior to her surgery, Mrs. Silva was taken on a stretcher to the pre-holding area of the surgical suite. Dr. Capati had originally been scheduled to administer Mrs. Silva's anesthesia, but she was busy with another patient and was unable to do so. Dr. Gurvich, who was on "second call," met Mrs. Silva for the first time as she lay on the stretcher outside the operating room, and began administration of her anesthesia almost immediately. No one discussed Dr. Gurvich's employment.
It was upon this evidence that the jury concluded, as it certainly could, that Dr. Gurvich appeared to be an agent of the hospital, and the fact that the hospital "hotly disputed" this conclusion is irrelevant.
[9] At first blush, the jury's exoneration of Dr. Cruz might seem inconsistent with the finding against the hospital. However, there was evidence that Dr. Cruz could not see Dr. Gurvich or Mrs. Silva's face while performing the surgical procedure and that she had to suture the incisions she had made before she could do anything for Mrs. Silva. The jury could have concluded on the evidence that the hospital personnel should have called a "code blue" before Dr. Cruz completed suturing Mrs. Silva's incisions, stood up, and first observed the patient's cyanotic face; that a "code blue" called prior to that time would have helped Mrs. Silva; and that a "code blue" called after that time would have been too late. Stated otherwise, the jury could have properly concluded that the hospital's employees' failure to call a timely "code blue" contributed to Mrs. Silva's death, but that Dr. Cruz's failure to call a "code blue" did not. The jury could also have concluded that Dr. Cruz reacted reasonably by seeking assistance from Dr. Silva, an internist, when she first observed Mrs. Silva's face, but that the operating room personnel acted unreasonably in not calling the "code blue" when Dr. Cruz left the operating room to obtain assistance.
[10] While some aspects of the hospital's conduct may have only decreased Mrs. Silva's chance of survival and thus not be actionable, see Gooding v. University Hospital Building, Inc., 445 So.2d 1015 (Fla. 1984), the jury's undifferentiated verdict against the hospital is supported by evidence that other aspects of the hospital's negligence more likely than not caused Mrs. Silva's irreversible brain damage and death. See nn. 8 and 9 supra.
[11] The witness whom Dr. Gurvich wished to call to impeach Dr. Silva's statement was the ex-husband of the woman whom Dr. Silva had been dating. The witness was "under a peace bond for having beaten [his ex-wife] up." Silva's counsel suggested that if the collateral issue were allowed to be explored, "we are going to wind up trying a messy divorce case here rather than who killed Mrs. Silva in an operating room." Dr. Gurvich's counsel stated simply that he was entitled to impeach the plaintiff. The trial court responded as follows:

"If you bring the witness in and you ask the question and he responds, then Mr. Spence [plaintiff's counsel] wants to come up and show motive for his response or the background or his animosity or his ill feelings. And then it goes on into a divorce case. And I am not in the family division. I don't want to hear any more divorce cases. I sat on that bench for eight years, and I am not about to start now, unless the Chief Judge directs me to go ahead with it. The motion is granted. I will not hear from this man. You can proffer his testimony. It is like water. You drink one drop and then it goes on to be a flood. And someone is going to die by drowning here."
In view of the fact that the impeachment evidence was directed to a purely collateral matter, and in view of the circumstances of the proposed witness's animosity toward his ex-wife and Dr. Silva, we think, at the very least, that reasonable persons could differ concerning the propriety of the trial court's ruling, and the trial court therefore did not abuse its broad discretion in excluding the impeachment evidence upon the collateral matter. See Canakaris v. Canakaris, 382 So.2d 1197 (Fla. 1980).
[12] Under Section 768.21(6)(c), Florida Statutes (1983), "evidence of remarriage of the decedent's spouse is admissible." It has been held that this evidence is admissible "for the sole reason of allowing the truth to be known and to keep the court from having to participate in a fraud upon the jury" but not to mitigate damages. Smyer v. Gaines, 332 So.2d 655, 658 (Fla. 1st DCA 1976). Whether this same theory of admissibility would support the admission of evidence of intention to remarry has not been decided. We think this decision is best left to the trial court under the circumstances of the particular case where the probative value of the statement revealing an intention to remarry is weighed against its potential prejudice.