DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**KEVIN DOLAN,**
Appellant/Cross-Appellee,

v.

**JONATHAN NEGRON,**
Appellee/Cross-Appellant.

No. 4D2024-1528

[April 15, 2026]

Appeal and cross-appeal from the Circuit Court for the Nineteenth Judicial Circuit, St. Lucie County; Brett Michael Waronicki, Judge; L.T. Case No. 562021CA000009AXXXHC.

Warren Kwavnick of The Law Office of Warren B. Kwavnick, PLLC, Pembroke Pines, for appellant/cross-appellee.

Andrew A. Harris and Grace Mackey Streicher of Harris Appeals, P.A., Palm Beach Gardens, and Alfred Russell Bell, Jr., and Neil Phillip Anthony of Steinger, Greene & Feiner, Port St. Lucie, for appellee/cross-appellant.

GROSS, J.

After a trial of a negligence case arising from a motor vehicle accident, a jury awarded the plaintiff precisely $1,000,000. On appeal, the defendant challenges several items of damages, which we agree were excessive. But we also agree with the plaintiff's argument, raised in the conditional cross-appeal, that if this court were to reverse on the damage elements requested by the defendant, any retrial on damages should include all damages issues. Accordingly, we reverse and remand for a new trial on permanency and all damages issues, as the matters justifying reversal were interrelated with the other damages issues.

### The Accident

On February 27, 2020, the parties were involved in an automobile accident when the defendant, Kevin Dolan, pulled onto the right shoulder of the road and then suddenly turned back onto the road, thereby causing a collision with plaintiff Jonathan Negron's box truck.

The plaintiff declined ambulance transport from the scene. A few hours later, he went to an emergency room complaining of severe pain and spasms in his neck and back. After taking x-rays, the emergency room diagnosed the plaintiff with neck and back sprains or strains. The emergency room discharged the plaintiff with pain medication and referred him to Dr. Daniel Husted's orthopedic group, which had treated the plaintiff before.

At trial, the defendant admitted he was solely at fault for causing the accident but disputed the extent of the plaintiff's resulting injuries and damages.

### *The Plaintiff's Prior Automobile Accidents*

Before the 2020 accident, the plaintiff sustained injuries in two automobile accidents: one in 2015 and another in 2017.

In 2015, the plaintiff was involved in a rear-end collision that caused him neck pain rated at 10 out of 10, accompanied by numbness and tingling radiating into his arms and hands. As a result, the plaintiff underwent two surgeries performed by Dr. Husted: a two-level cervical fusion and a one-level lumbar fusion. The plaintiff received a permanent impairment rating of 8% as a result of the 2015 accident and ensuing surgeries.

In 2017, the plaintiff was involved in another car accident that caused him neck and back pain rated at 10 out of 10, accompanied by numbness, tingling, and shooting pains. The plaintiff received injections in his neck and back for pain management, which successfully allowed him to return to work doing water remediation without physical restrictions and without needing any further medication.

The plaintiff admitted that between the 2017 accident and the 2020 accident, he would have occasional "aches and pains" after a long day of manual labor.

### *Claimed Injuries and Treatment from the 2020 Accident*

Following the 2020 accident, the plaintiff initially pursued conservative treatments including physical therapy and epidural steroid injections to his back and neck. By the end of summer 2020, the plaintiff's symptoms worsened and required surgery.

In October 2020, the plaintiff underwent a lumbar laminectomy, which involves removal of a portion of disc material and bone from the lumbar spine. The laminectomy, which improved but did not eliminate the plaintiff's back pain, was a less extensive procedure than the fusion surgeries performed following the 2015 accident. The plaintiff knew going into the October 2020 surgery that it would involve "a long recovery time" and that he would find it "difficult . . . to get work again."

The plaintiff's treating physicians testified that the subject accident in 2020 either caused or exacerbated disc herniations in the cervical and lumbar spine at levels adjacent to those previously operated upon following the 2015 accident; they maintained that the 2020 injuries to the plaintiff's neck and back were permanent.

By contrast, the defense medical experts testified that (1) there were no meaningful differences between the MRIs before and after the subject accident, (2) there was no objective evidence the plaintiff sustained any permanent injury as a result of the accident, (3) there was no objective evidence the subject accident caused the need for the surgery or the epidural steroid injections, and (4) the plaintiff does not require any future care as a result of this accident. For example, the defense neurosurgeon testified that, if one were to accept the plaintiff's subjective complaints, the plaintiff may have sustained a temporary soft tissue injury like a sprain or a strain, for which "a month or two" of conservative care with a chiropractor or physical therapist would be reasonable.

### Claim for Past Medical Expenses

At trial, the plaintiff sought past medical expenses totaling $190,523.10. This figure included amounts paid by workers' compensation for the medical treatment arising from this accident.

The parties agreed to inform the jury about workers' compensation payments made toward the plaintiff's medical expenses and lost wages. Specifically, the jury was instructed that workers' compensation had paid a substantial portion of the plaintiff's past medical bills and 60 percent of his past lost wages.

Defense counsel argued in closing that the plaintiff's injuries were at most a sprain or strain for which six to eight weeks of conservative care was appropriate. Relying on the plaintiff's exhibit showing $31,571.32 in outstanding medical bills, defense counsel told the jury: "I'm not going to have you all do math. For the sake of argument, just give [the plaintiff] the past bills of 31,000, call it 32, 32,000."

### *Claim for Future Medical Expenses*

Dr. Husted testified that the plaintiff would require future medical care as a result of the 2020 accident. A mortality table showed that the plaintiff was expected to live for another 40.2 years.

Dr. Husted testified that the plaintiff would require a four-level cervical spinal fusion surgery in about ten years at a cost of $100,000, which would cause the plaintiff to lose half of his range of motion. For the next ten years until that surgery, Dr. Husted testified, the plaintiff will require ongoing treatment. During some years, the plaintiff will need a full course of 60 sessions of physical therapy at a cost of $200 per session; in other years, he will need fewer sessions.

Dr. Husted further testified that the plaintiff would also require injections up to four times a year at a cost of $3,000 per injection, as well as various medications, diagnostic imaging every year or two, and periodic doctor visits billed according to the workers' compensation fee schedule. Even if the future cervical surgery were successful, the plaintiff would still require ongoing prescription anti-inflammatory medication as needed, occasional muscle relaxants, periodic diagnostic imaging, and follow-up physician visits about four times per year.

In closing argument, the plaintiff sought a total of about $811,000 in future medical expenses, consisting of physical therapy at $3,000 per year, doctor appointments at $300 four times a year, four injections a year at $3,000 each, neck surgery at $100,000, and prescription medication at $4,000 per month.

The jury ultimately awarded $478,500 in future medical expenses. Significantly, the jury also found that the plaintiff did **not** suffer a permanent injury.

### *Claim for Past Lost Earnings*

The plaintiff is a high school graduate. At the time of the 2020 accident, he was employed as a water remediation technician, a job involving physical labor and heavy lifting. The plaintiff had worked in water remediation for over ten years at the time of trial.

The plaintiff previously worked as a pizza delivery driver until 2013. Thereafter, he worked at a number of water restoration companies, spending about one year at each position.

4

The plaintiff began employment with Restoration One in January 2020, earning $24.50 per hour or about $1,000 weekly.

Following the accident, the plaintiff was assigned to light duty. He worked 52 hours the week of the accident, 37.5 hours the following week, 19 hours the next week, and 29 hours the week after that. The plaintiff's work hours thereafter had ups and downs, but they demonstrated a declining trend overall. The plaintiff admitted that the onset of COVID "affected [his] job" and resulted in his hours "getting smaller and smaller."

The plaintiff was fired from Restoration One in May 2020, but he provided no testimony explaining the reason for his termination. At some point after the accident, the plaintiff applied for work at another water remediation company. Over the summer of 2020, the plaintiff was "just trying to recover" and filling out job applications. Dr. Husted testified that the plaintiff's symptoms were worsening in the summer of 2020 even though the plaintiff was not working, but Dr. Husted did not explicitly opine that the plaintiff was unable to work during this time.

Following the plaintiff's recovery from the 2020 lumbar laminectomy surgery, he began seeking employment in 2021. During that year, he received only one job callback, which was for employment at a pizza restaurant offering $13 per hour. The plaintiff testified that he earned approximately $200 during all of 2021.

During the summer of 2022, after unsuccessful efforts to find a less physical job, the plaintiff returned to water remediation work. In his most recent water remediation job, the plaintiff earned $25 an hour. However, in January 2024, he was terminated from that job. Although the plaintiff initially refused to say his termination in January 2024 was entirely unrelated to his injuries from the subject accident, he admitted on further questioning that he was let go because he damaged a company truck while driving under a building's archway.

The evidence established that workers' compensation paid the plaintiff $43,052.02 to compensate him for 60% of his lost wages, with payments being made from August 2020 to November 2021. This implies that workers' compensation calculated the total wage loss to be $71,753.67.

During closing arguments, the plaintiff's counsel asked the jury to award the remaining 40% of lost wages that was unpaid by workers' compensation: "[Y]ou can certainly award [the plaintiff] for the time he was unable to find a job $1,000 a week. What [the plaintiff] is asking you to

do is to take the $43,000 in indemnity at 60 percent and award the other 40 percent of what it is that Workers' Compensation paid him for the time."

Similarly, defense counsel argued in closing that because workers' compensation had paid the plaintiff 60% of lost wages, it would not be a problem if the jury were to give him "another $15,000."

Both sides' closing arguments on the past lost earnings claim were at odds with the jury instructions. The trial judge instructed the jury that the workers' compensation insurer would be entitled to repayment for all payments caused by the crash and that such payments should not reduce the amount of compensation to which the plaintiff would otherwise be entitled.

The jury awarded $161,000 for past lost earnings.

### Claim for Future Lost Earning Capacity

The plaintiff testified that he does not believe he can continue performing water remediation work indefinitely. Likewise, Dr. Husted stated that "the goal would be that [the plaintiff] changes what he does for a living." Dr. Husted explained that the plaintiff's current occupation would be "very hard to do" after a four-level cervical fusion and two prior back surgeries.

The plaintiff testified that he hoped to return to school for two or four years and get a degree that would allow him to get another good job. He said he would need about $50,000 per year in income replacement while attending school. The plaintiff noted that tuition and books at the local state college would cost about $4,000 or $5,000 per year. Thus, for a two-year associate's degree at the local state college, the plaintiff estimated that the total cost would be $110,000, including both lost income and tuition and books. For a four-year bachelor's degree program, the plaintiff estimated that the total cost would be $220,000.

During closing arguments, the plaintiff's counsel addressed the claim for future lost earning capacity, asking the jury to award two years of the plaintiff's $50,000 annual salary plus $4,000 for tuition and books. The plaintiff's counsel argued that this award would allow the plaintiff to retrain for a different job and "increase his earning capacity because he's no longer able to use the earning capacity that he has."

By contrast, the defense argued in closing that the plaintiff was entitled to nothing for loss of future earning capacity because he "went back to

6

work" and the accident had "nothing to do with" why he got fired or why he "hasn't been able to retain a job."

Ultimately, the jury awarded $328,500 for loss of earning capacity in the future.

### *The Verdict*

To recap, the jury returned a verdict awarding the following damages:

- $32,000 for past medical expenses
- $478,500 for future medical expenses
- $161,000 for lost earnings in the past
- $328,500 for loss of earning capacity in the future

The jury also found that the plaintiff did not suffer a permanent injury and thus did not award any non-economic damages.

The total damages award was $1,000,000. Neither party raised any contemporaneous objection to the consistency of the verdict before the jury was discharged.

### *Post-Verdict Proceedings*

The defendant moved for remittitur or alternatively, for a new trial. The defense challenged the awards for future medical expenses, lost wages, and loss of future earning capacity as excessive and against the manifest weight of the evidence, especially given the jury's finding that the plaintiff did not sustain a permanent injury. The defendant requested a remittitur to $47,500 for future medical expenses, $20,500 for lost wages, and $0 for loss of future earning capacity. The defendant alternatively requested a new trial for essentially the same reasons that he sought a remittitur.

The trial court denied the defendant's post-trial motion, prompting this appeal.

### *The Parties' Arguments on Appeal*

The defendant contends that the trial court abused its discretion by denying a new trial or remittitur where three of the four components of damages awarded by the jury were excessive and unsupported by the evidence.

First, as to the jury's award of $161,000 for past loss of earnings, the defendant asserts that such amount was excessive and unsupported by the evidence, as "there was simply no evidence demonstrating or quantifying any missed work or loss of past earnings as a result of the accident."

Second, the defendant argues that the jury's award for loss of future earning capacity was excessive and unsupported by the evidence "because there was no evidence quantifying any claimed diminution in [p]laintiff's ability to earn money as a result of the accident or supporting an award of $328,500 in particular."

Third, the defendant says that the jury's award of future medical expenses was excessive and unsupportable given the jury's finding that the plaintiff did not sustain a permanent injury.

The plaintiff answers that the trial court did not abuse its discretion in denying a new trial or remittitur. Alternatively, the plaintiff argues that any new trial on damages should include a determination of whether he suffered a permanent injury, and if so, a determination of non-economic damages, as well as all damages elements.

### *Discussion of Applicable Law*

An order denying a motion for new trial or remittitur is reviewed for an abuse of discretion. *Gen. Emps Ins. Co. v. Isaacs*, 206 So. 3d 62, 63 (Fla. 4th DCA 2016).

A trial court may order a new trial on the ground that a verdict is excessive if "(1) the verdict shocks the judicial conscience or (2) the jury has been unduly influenced by passion or prejudice." *Brown v. Est. of Stuckey*, 749 So. 2d 490, 498 (Fla. 1999). "It is not necessary that a court inquire and declare what wrongful influence or failure of duty brought about an excessive verdict." *Loftin v. Wilson,* 67 So. 2d 185, 190 (Fla. 1953). "Where the amount of an award is such as to indicate passion or prejudice, a new trial must be ordered." *Id.*

Because of the deference afforded to both the trial judge and the jury's factual determinations, the law favors "a very restricted review of an order denying a motion for new trial on ground of excessive verdict." *Nordt v. Wenck*, 653 So. 2d 450, 452 (Fla. 3d DCA 1995) (quoting *Lassitter v. Int'l Union of Operating Eng'rs*, 349 So. 2d 622, 627 (Fla. 1977)).

8

In addition to the common law standard for ordering a new trial based on an excessive verdict, the legislature has provided the remedy of remittitur. The standards for granting a new trial due to an excessive verdict and for ordering a remittitur are distinct. *See Marinec v. Progressive Select Ins. Co.*, 351 So. 3d 181, 184 (Fla. 2d DCA 2022) (holding that the trial court erroneously relied upon the remittitur statute in granting a motion for new trial where remittitur motion was legally insufficient).

Upon proper motion following a verdict awarding damages in an action arising out of the operation of a motor vehicle, the court has the responsibility "to review the amount of such award to determine if such amount is clearly excessive or inadequate in light of the facts and circumstances which were presented to the trier of fact." § 768.043(1), Fla. Stat. (2023). "If the court finds that the amount awarded is clearly excessive or inadequate, it shall order a remittitur or additur, as the case may be." *Id.* "If the party adversely affected by such remittitur or additur does not agree, the court shall order a new trial in the cause on the issue of damages only." *Id.*

In determining whether a verdict is excessive, a court shall consider the following factors:

(a) Whether the amount awarded is indicative of prejudice, passion, or corruption on the part of the trier of fact.

(b) Whether it clearly appears that the trier of fact ignored the evidence in reaching the verdict or misconceived the merits of the case relating to the amounts of damages recoverable.

(c) Whether the trier of fact took improper elements of damages into account or arrived at the amount of damages by speculation or conjecture.

(d) Whether the amount awarded bears a reasonable relation to the amount of damages proved and the injury suffered.

(e) Whether the amount awarded is supported by the evidence and is such that it could be adduced in a logical manner by reasonable persons.

§ 768.043(2), Fla. Stat. (2023).

9

### *Application to this Case*

*A. Past Lost Earnings*

An award of past lost earnings requires evidentiary support. *See Eagle Atl. Corp. v. Maglio,* 704 So. 2d 1104, 1105 (Fla. 4th DCA 1997). Here, we conclude that the jury's award of $161,000 for past loss of earnings was excessive and unsupported by the evidence.

We question whether the plaintiff presented any competent evidence quantifying the amount of past loss of earnings caused by the accident. The plaintiff offered no proof that his reduced hours in the months after the accident were related to his injuries as opposed to the onset of the COVID pandemic. Also, the plaintiff presented no evidence that his May 2020 termination was caused by the accident. Further, although the plaintiff obviously needed time to recover from his October 2020 surgery before looking for a job, the plaintiff offered no evidence that he would have been employed during this time but for the accident or surgery. Significantly, the plaintiff was unable to secure employment even when he started applying for work in 2021. In sum, the plaintiff offered no specific evidence establishing precisely how long he was unable to work following his October 2020 surgery.

An award of $161,000 in past lost earnings was excessive on its face. The plaintiff offered no evidence that all his periods of unemployment and reduced hours during the four years between the time of the accident and the time of trial were caused by the accident. Even if the jury attributed the entire period of unemployment from the plaintiff's firing at the end of May 2020 through the time he returned to water remediation in mid-2022—which would appear to be improper given the lack of evidence that the accident caused this extended unemployment—this roughly two-year period would correspond to around $100,000 at an annual salary of $50,000. And the plaintiff never established that his January 2024 firing was related to his injuries from the 2020 accident, as the plaintiff admitted that such firing occurred because he accidentally damaged a company truck.

The plaintiff engages in creative math when he urges that the $71,000 corresponding to the workers' compensation award for lost wages can be added to this "$100,000 for two years" figure. Contrary to the plaintiff's argument, there was no evidence that the $71,000 figure represented "wages before the [p]laintiff lost his job." In fact, the workers' compensation payout schedule suggested that the lost-wages benefit was paid from August 2020 through November 2021, which was after the

plaintiff lost his job in May 2020. Regardless, the $71,000 figure cannot possibly represent lost wages during three-month period between the February 2020 accident and the May 2020 firing, given that the plaintiff earned only $50,000 per year.

The award of $161,000 for past lost earnings was excessive and unsupportable. It bore no reasonable relationship to the amount of damages proven. Thus, the trial court abused its discretion in denying a remittitur or new trial with respect to this element of the jury's award. However, for the reasons explained below, we reverse and remand for a new trial instead of a remittitur.

### B. Future Medical Expenses

The defendant did not preserve the argument that the award of future medical expenses was inconsistent with the finding of no permanent injury. "To preserve the issue of an inconsistent verdict, the party claiming inconsistency must raise the issue before the jury is discharged and ask the trial court to reinstruct the jury and send it back for further deliberations." *Coba v. Tricam Indus., Inc.*, 164 So. 3d 637, 644 (Fla. 2015) (quoting *Ellender v. Bricker*, 967 So. 2d 1088, 1091 (Fla. 2d DCA 2007)).

However, an argument that a verdict for future medical expenses was excessive given the jury's finding of no permanent injury is preserved if it was raised in a motion for new trial or remittitur, even if the defendant failed to raise the issue before the jury's discharge. *Progressive Select Ins. Co. v. Lorenzo*, 49 So. 3d 272, 276–77 (Fla. 4th DCA 2010).

"Although a permanent injury is not a prerequisite to recovering future economic damages, it is a significant factor in establishing the reasonable certainty of the future damages." *Auto-Owners Ins. Co. v. Tompkins*, 651 So. 2d 89, 91 (Fla. 1995).

In *Owen v. Morrisey*, 793 So. 2d 1018, 1022–23 (Fla. 4th DCA 2001), we held that a verdict allowing a plaintiff to recover all future economic damages for his life expectancy and work life expectancy without a finding of a permanent injury was "inconsistent and excessive," because "a finding of a permanent injury is essential to establish these damages with reasonable certainty." We explained:

> Although a finding of a permanent injury is not a prerequisite for an award of future economic losses, it also cannot be ignored. In the instant case, the jury's award of future economic damages is inextricably linked to the evidence of a

11

> permanent injury. Without the finding by the jury of a permanent injury, this verdict is inconsistent and excessive and must be reversed.

*Id.* at 1023.

Here, the jury's award of $478,500 in future medical expenses was excessive in light of the jury's finding that the plaintiff did not sustain a permanent injury.[1] Whether or not the award necessarily included the plaintiff's future surgery in ten years, an award of $478,500 in future medical expenses necessarily envisions substantial additional medical care for most or all of the plaintiff's remaining life expectancy. Without a finding of permanent injury, this verdict is excessive and must be reversed.

## C. *Loss of Future Earning Capacity*

For substantially the same reasons, we conclude that the jury's award of $328,500 for loss of earning capacity in the future was excessive in light of the jury's finding that the plaintiff did not sustain a permanent injury. A finding of permanent injury was essential to establishing these damages with reasonable certainty.[2]

---

[1] If the jury had determined that the plaintiff's injury was permanent, the award would not have been excessive. The plaintiff presented competent, substantial evidence that he would need extensive medical care for the rest of his life, including a four-level surgery in about ten years.

[2] We need not decide whether, if the jury had determined that the plaintiff's injury was permanent, an award of $328,500 in loss of future earning capacity might have been supportable. In other words, we need not decide whether the evidence that the plaintiff's water remediation career would end in about ten years once he underwent his prospective surgery, coupled with the evidence that the only job the plaintiff could get outside the field of water remediation post-accident was for $13 an hour at a pizza restaurant, could have supported the award if the jury had found permanency. However, for the parties' benefit on remand, we note that the opportunity cost of attending a community college (two years' lost salary plus tuition and books) was not a proper measure of lost future earning capacity. Such evidence did not amount to competent, substantial evidence of damages for lost future earning capacity. An award for lost future earning capacity is measured by the plaintiff's diminished ability to earn income in the future, not the opportunity cost of vocational retraining. *See Rasinski v. McCoy*, 227 So. 3d 201, 204 (Fla. 5th DCA 2017) ("To establish a claim for loss of future earning capacity, the plaintiff must introduce reasonably certain evidence that the capacity to labor has been diminished and that there is a monetary standard against which the jury can measure any future loss.") (cleaned up).

*D. The Only Workable Remedy is a New Trial on Damages*

Regardless of whether we analyze the question of excessiveness under the remittitur statute or under the common law standard, all three challenged damages awards were excessive. However, a remittitur would be impractical under the circumstances of this case. It would be difficult to arrive at a reasonable remittitur figure for the three challenged damages categories, particularly as to the two future damages categories for which the jury awarded substantial damages yet found no permanent injury. Another complicating factor is that the trial judge who presided over the original trial is no longer on the bench. In any event, the plaintiff's briefing strongly suggests that the plaintiff would not agree to a remittitur if this court were to reverse the final judgment. Therefore, the only workable remedy is a new trial on damages. As we explain below, the scope of this new trial shall encompass all damages issues.

### *The New Trial on Remand Shall Encompass All Damages Issues*

We agree with the plaintiff that the jury's award was "likely the result of a compromise verdict," as the jury's findings of no permanency and only $32,000 in past medical expenses are difficult to reconcile with the award of $478,500 in future medical expenses. We therefore reverse for a new trial on all damage issues.

Section 59.35, Florida Statutes (2025), provides:

> An appellate court may, in reversing a judgment of a lower court brought before it for review by appeal, by the order of reversal, if the error for which reversal is sought is such as to require a new trial, direct that a new trial be had on all the issues shown by the record or upon a part of such issues only.

As appellate courts have applied this statute, remand directions are generally "within the discretion of the appellate court." *R.J. Reynolds Tobacco Co. v. Prentice*, 290 So. 3d 963, 967 (Fla. 1st DCA 2019), *approved*, 338 So. 3d 831 (Fla. 2022); *Reina v. Klisivitch*, 419 So. 3d 246, 254 (Fla. 6th DCA 2025). Such an exercise of discretion is guided by "basic principles of equity and fairness fashioned to the particular facts and circumstances of the case." *Tracey v. Wells Fargo Bank, N.A. as Tr. for Certificateholders of Banc of Am. Mortg. Sec., Inc.*, 264 So. 3d 1152, 1160 (Fla. 2d DCA 2019).

A limitation on an appellate court's discretion is that "a new trial 'limited to a single issue is inappropriate when the new trial is necessitated

13

by some error at trial which has prejudiced the jury broadly on all issues,' or when 'the issue is interrelated with another issue or is not separable from another issue.'" *Seven Rests., LLC v. Tulecki*, 391 So. 3d 949, 963 (Fla. 4th DCA 2024) (quoting *Cedars of Lebanon Hosp. Corp. v. Silva*, 476 So. 2d 696, 704 (Fla. 3d DCA 1985)). "[A]fter granting a new trial on one issue, an appellate court must order retrial of other issues when the issues are 'inextricably intertwined.'" *Polynice v. Burger King Corp.*, 351 So. 3d 619, 620 (Fla. 3d DCA 2022). "This is so because if the trial court 'were to retry only one of two such intertwined issues to a second jury, while maintaining the vitality of the first jury's findings on the other issue, it would cause confusion and uncertainty and, thus, an unfair trial.'" *Prentice*, 290 So. 3d at 967 (quoting *Morrison Knudsen Corp. v. Fireman's Fund Ins. Co.*, 175 F.3d 1221, 1255–56 (10th Cir. 1999)).

Reversal of a compromise verdict is one situation calling for retrial of all hotly contested issues.

"A compromise verdict is a verdict which is reached only by the surrender of conscientious convictions upon one material issue by some jurors in return for a relinquishment by others of their like settled opinion upon another issue and the result is one which does not command the approval of the whole panel, and, as such, is not permitted." *Smith v. Fla. Healthy Kids Corp.*, 27 So. 3d 692, 694–95 (Fla. 4th DCA 2010) (cleaned up). The most common examples of compromise verdicts are those "characterized by the common elements of hotly contested liability and legal inadequacy of damages." *Id.* at 694. For example, "a new trial on both liability and damages is appropriate when a damage award is clearly inadequate and the issue of liability is hotly contested, because such circumstances give rise to a suggestion that the jury may have compromised its verdict." *Street v. H.R. Mortg. & Realty Co.*, 949 So. 2d 1158, 1161 (Fla. 4th DCA 2007) (cleaned up). Moreover, "case law does not require actual proof that the jury *did* compromise its verdict." *Id.* at 1162.

A second situation calling for retrial of all hotly contested issues occurs when the point requiring reversal is "interrelated with another issue or is not separable from another issue." *Silva*, 476 So. 2d at 704.

For example, in *Owen*—a case upon which the defendant relies to argue that the future medicals were excessive given the finding of no permanent injury—we remanded for the retrial to *include* the issue of permanency. 793 So. 2d at 1026. We explained that "the case should be treated as one in which the trial court has directed a verdict on negligence and it remains

14

for the jury to determine what damages, *permanent or non-permanent*, were caused by the negligence." *Id.* (emphasis added).

To the same point, *Ludwig v. Ladner*, 637 So. 2d 308, 310–11 (Fla. 2d DCA 1994), involved a situation similar to this case, where a jury found no permanent injury yet awarded the plaintiff future damages that "would be incurred over a recovery period equal to his expected life-span[.]" The court found such damages to be "excessive if the jury in fact determined that [the plaintiff] sustained no permanent injury." *Id.* at 310. The Second District was "unwilling to assume that the jury understood and followed the law in deciding whether [the plaintiff's] injury [was] permanent," so the court ordered a new trial on both permanency and future damages. *Id.* at 311. In short, the issue of permanency was interrelated to the issue of future damages. *Id.* at 310; *see also Garriga v. Guerra*, 753 So. 2d 146, 147 (Fla. 3d DCA 2000) (reversing for new trial due to an inconsistent verdict where "the only evidence of the need for future medical expenses in this case was inextricably linked to the evidence of a permanent injury").

We reject the defendant's attempt to limit the retrial to the three damage awards he dislikes while preserving the "favorable" verdicts on permanency and past medical expenses.

The jury's verdict of exactly $1 million was likely the result of a compromise arrived at by irreconcilable findings. There is strong reason to suspect that the jury's verdict—a precise $1 million total with incompatible and incomprehensible findings—was the result of a compromise verdict, rather than a careful assessment of the evidence pertaining to each question on the verdict form. Contrary to the defendant's argument, a compromise verdict is not limited to a situation of clearly-inadequate damages plus hotly-contested liability. Rather, that is simply the most common form of a compromise verdict. In this case, whether the plaintiff suffered a permanent injury caused by the 2020 accident was hotly contested. So too were all damages issues.

As explained above, given the jury's finding that the plaintiff did not sustain a permanent injury, there was no rational basis for the jury to conclude that he would need $478,500 in future medical expenses. But the converse is also true. Given the jury's finding that the plaintiff would need $478,500 in future medical expenses, there was no rational basis for the jury to conclude that he did not sustain a permanent injury. The issue of permanency is interrelated with and inseparable from the issue of future medical expenses in this case, warranting a new trial on both issues.

Similarly, the award of $32,000 in past medical expenses—which represented outstanding past medical expenses that defense counsel argued the jury could award as a mathematical shortcut for estimating the cost of a few weeks of conservative care for a sprain or strain—was irreconcilable with the finding that the plaintiff was so severely injured that he would need $478,500 in future medical expenses. Under the facts of this case, the issue of past medical expenses was interrelated with and inseparable from the issues of permanency and future medical expenses.

Like the court in *Ludwig*, in light of the jury's finding that the plaintiff's future medical expenses would amount to $478,500, we are "unwilling to assume that the jury understood and followed the law" in deciding whether his injury was permanent and the amount of past medical expenses. *See* 637 So. 2d at 311.[3]

We reverse for a new trial on all damages issues, including permanency. This result is consistent with *Owen*, where we ordered that the retrial would encompass all issues regarding "what damages, permanent or non-permanent, were caused by the negligence." 793 So. 2d at 1026 (where verdict was "inconsistent and excessive" due to jury's award of over $1 million in future damages after the jury found no permanency).

*Reversed and remanded.*

CIKLIN and CONNER, JJ., concur.

*　　　*　　　*

***Not final until disposition of timely-filed motion for rehearing.***

---

[3] We distinguish *ITT Hartford Insurance Co. of the Southeast v. Owens*, 816 So. 2d 572 (Fla. 2002), relied upon by the defendant, as a case where the jury's tainted findings were not interrelated with other issues. There, the Florida Supreme Court emphasized that "future medical damages constitute[d] a discrete item of recovery, separate from other damages." *Id.* at 577.